UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------x
GOWANUS INDUSTRIAL PARK, INC.,

               Plaintiff,

                                         MEMORANDUM AND ORDER
-against-                             01-CV-0902 (ILG)

AMERADA HESS CORP.,
               Defendant.
------------------------------------------------------x

GLASSER, United States District Judge:

      Plaintiff Gowanus Industrial Park, Inc. ("GIP") brings this action against the Amerada

Hess Corporation ("Hess") regarding a property dispute over the Henry Street Basin, a navigable

tidal water extending from the Gowanus Bay in the Upper New York Bay. For convenience, a

map appended to this memorandum and order shows the basin and the surrounding area as laid

out pursuant to an 1875 statute. First, GIP alleges that it has title to the entire Henry Street

Basin, but that Hess wrongfully placed and maintains a bulkhead about five to six feet on the

wrong side of the property line. GIP seeks a declaration therefore that (i) this bulkhead lies

within the property to which GIP claims title ("the property"), (ii) GIP is the sole and exclusive

legal and equitable owner of the property, including the bulkhead, (iii) GIP solely is entitled to

use of and access to the bulkhead, and (iv) Hess has no legal or equitable claim to any part of the

Henry Street Basin or the bulkhead. GIP also seeks compensatory and punitive damages for this

alleged trespass.

      Second, GIP alleges that the property includes all the land under water that lies to the

west of a five hundred foot long pier that reaches southward from Hess's property into the

Gowanus Bay, a point that Hess does not contest. GIP claims that Hess is wrongfully using the

1

property by mooring boats and barges along the western side of the pier. For this incursion, GIP also seeks a declaratory judgment and monetary damages.

Hess now moves for summary judgment. Hess argues that Hess (and not GIP) has title to part of the Henry Street Basin, that its actions are permitted under its riparian rights, and that in any event the prior owner of the property acquiesced in placing the property line at the bulkhead rather than the actual edge of the Henry Street Basin, five to six feet east of the bulkhead. Hess also argues that state law prohibits the conveyance of the property, and that therefore any title to the land claimed by GIP is void.

In response, GIP cross-moves for summary judgment. GIP argues that it has clear title to the land because of a release executed by the New York Department of Transportation, that the bulkhead lies on its property and constitutes an ongoing trespass, and that Hess's common law riparian rights either no longer exist after the development (pursuant to statute) of the Brooklyn waterfront or do not extend to maintaining the bulkhead or using of the western side of the pier.

For the reasons stated below, GIP's cross-motion for summary judgment is denied in most part except for a declaration that the bulkhead does lie within the property to which it seeks to claim title. However, GIP does not own the property, which by state law cannot be conveyed and in any event cannot be conveyed simply by obtaining a release from a state department that no longer has any responsibility for the property. GIP's other trespass claims fail because there are no facts to show title or a possessory interest in the property sufficient to support such a claim, and also because the mooring of boats along the western side of Hess's pier is protected by the general rights of the public to navigate those waters. Hess's motion for summary judgment therefore is granted for the most part on the declaratory judgment claims, and as to all claims of trespass.

2

## BACKGROUND

### The History of the Henry Street Basin

In 1698 Governor Benjamin Fletcher deeded to Stephen Van Courtland the lands from the

East River to a creek that is today Henry Street in Brooklyn. *See First Constr. Co. of Brooklyn v.*

*State of New York*, Claim No. 885-A, slip op. at 2 (N.Y. Ct. Cl. Jan. 28, 1920) ("*First*

*Construction III*") (making findings of fact and conclusions of law regarding appropriation of

lands including the Henry Street Basin).[1] These lands were bounded on the east by the lands of

Frederick Lubertsen, who in 1642 acquired the uplands east of what is today Henry Street from

the Director General on behalf of the States General and the Dutch West Indies Company. *Id.*

William Beard acquired the Van Courtland upland bordering the Gowanus Bay prior to April 3,

1851, and acquired the Lubertsen upland bordering the Gowanus Bay (from Henry Street to

Court Street) in April 1867. *Id.* at 2-3. Although the record is not entirely clear, it appears that at

some point between 1851 and 1885, title in the Van Courtland upland came to be held by both

William Beard and his wife Mary A. Beard.

Between 1851 and 1884, the New York State Legislature passed a number of statutes

permitting Beard to construct a series of wharves and docks southward into the Gowanus Bay. In

---

[1]     The *First Construction* litigation involved a claim for lands appropriated by the
State of New York pursuant to statutory authorization in 1911. After the Appellate Division
initially upheld an award of compensation for the fee interest in the lands under water in the Erie
Basin, *see First Constr. Co. of Brooklyn v. State of New York*, 174 A.D. 560, 156 N.Y.S. 911 (3d
Dep't 1916) ("*First Construction I*"), the Court of Appeals reversed that decision in part, holding
that the owners held only a franchise in the lands under water and not the fee. 221 N.Y. 295,
302, 116 N.E. 1020, 1021 (1917) ("*First Contsruction II*").
        On remand, the Court of Claims made findings of fact and conclusions of law in
*First Construction III*, and subsequently entered judgment in favor of the claimant based on the
value of the franchise. *See* 110 Misc. 164, 180 N.Y.S. 241 (1920) ("*First Construction IV*").
The Appellate Division affirmed that judgment. 194 A.D. 608, 186 N.Y.S. 159 (3d Dep't 1921)
("*First Construction V*").

1857, the Legislature established a basin extending the entire waterfront from Van Brunt Street to Court Street (and also along the easterly shore of the Gowanus Bay) by demarcating lines for bulkheads and seawalls farther out in the harbor (the "seawall line"). 1857 N.Y. Laws Ch. 763. In 1862, the Legislature authorized Beard to "erect, construct, build and maintain seawalls or breakwater piers, docks, wharves, bulkheads, piers and warehouses and a basin" on lands under water from Van Brunt Street to Otsego Street out to the bulkhead line, creating a basin that was named the Erie Basin. 1862 N.Y. Laws Ch. 480. In 1866, the Legislature similarly authorized Beard to build a bulkhead along the 1857 bulkhead line, creating a basin known as the Brooklyn Basin between Otsego and Court Streets. 1866 N.Y. Laws Ch. 856.

In 1875, the Legislature again changed the scope of the developing Brooklyn waterfront. Based upon the recommendations of a Presidential Commission established two years earlier, the Legislature revised the "pier, bulk-head and other lines" to create two new basins (along the continuation of Henry Street and along the continuation of Hicks Street) out of the Brooklyn Basin. 1875 N.Y. Laws Ch. 398. In addition to laying out the metes and bounds of the newly altered pier and bulkhead lines (the "bulkhead line"), the 1875 Act also stated that the lines established therein were laid out on a map dated March 1, 1875, a copy of which is attached to this memorandum. The 1875 Act permanently carved the 200' width of the Henry Street Basin out of the grant permitting Beard to fill the lands under water. In order to correct what was apparently an oversight in the prior statutes, a statute enacted in 1884 attempted to remedy the failure in the previous acts to transfer actual title to the lands under water by confirming that Beard and other upland owners held title in fee simple to "all grants of land under water within or to the exterior boundary line appearing upon said [1875] map." 1884 N.Y. Laws Ch. 491.

4

In 1912, pursuant to statute, New York appropriated lands to the west of the Henry Street

Basin to make it part of the New York Barge Canal System. *See* 1911 N.Y. Laws Ch. 746

(authorizing state appropriation of lands in the Gowanus Bay area). The owners of the lands

(successors to the Beards' estate) filed a claim against the State for the appropriation of these

lands, which "for the most part" consisted of land "within the tideway of the Gowanus Bay." *See*

*First Construction II*, 221 N.Y. at 302, 116 N.E. at 1021. The plaintiffs in part sought

compensation for the lands underlying parts of Henry and Columbia Streets, and the lands under

water in the Hicks Street and Henry Street Basins. *See First Construction I*, 174 A.D. at 567,

156 N.Y.S. at 914-15. The Court of Claims appointed as referee Judge Albert Haight (then

retired from the Court of Appeals), who held that the fee interest of "the streets mentioned, *like*

*that of the Henry [S]treet [B]asin* and Hicks [S]treet [B]asin, still vests in the people of the

state." *Id.*, 174 A.D. at 567, 156 N.Y.S. at 915 (emphasis added). On appeal, these holdings

were affirmed "so far as they hold that claimant is not entitled to any award on account of so

much of the appropriated area as is included within the lines bounding and defining Hicks street

and Henry street basins and within the lines of Henry street and Columbia street." *First*

*Construction II*, 221 N.Y. at 324-25, 116 N.E. at 1029. In other words, Judge Haight held that

the land under water in the Henry Street Basin had never been conveyed to Beard.[2]

---

[2]     The Court of Appeals, however, held that because the title of the 1884 Act only
sought to "ratify and confirm" the earlier grants, to the extent that the 1884 Act purported to
transfer fee simple title to lands under water that had not been filled in, the Act would violate the
State Constitutional prohibition against private bills embracing more than their title. *See First*
*Construction II*, 221 N.Y. at 320-21, 116 N.E. at 1027. Under the Court of Appeal's
interpretation, the 1884 Act was limited to ratifying and confirming Beard's fee interest solely in
the lands filled in, and that as to the remaining lands under water, Beard retained solely a
franchise interest.

5

**GIP's Interest in the Land**

In 1944, the Legislature determined that these lands appropriated in 1912, known as the Gowanus Bay Terminal, were no longer necessary or useful as a part of the barge canal system, and therefore transferred the property to the Port Authority of New York (the "Port Authority"). 1944 N.Y. Laws Ch. 410 §2.  Although neither party mentions this provision, the Court notes that the Legislature exempted the property from all taxes.  *Id.*, §13.

The transfer of title was subject to two requirements in perpetuity: (i) the Port Authority could not permit the use of the "pier properties for any purpose which will materially and substantially interfere with their use for pier and terminal purposes, nor . . . enter into any agreement, other than a revocable permit, for the exclusive use of said pier properties for a period in excess of six months except with the consent of the state superintendent of public works," and (ii) the Port Authority "shall not grant or convey title to said pier properties to any person or legal entity other than the state."  *Id.*, §3(b) and (c); *see also id.*, §6 (stating that after ten years, the Port Authority's title to the property is subject only to those two conditions).  The legislature provided that if the Port Authority violated either condition, "then at the option of the state the pier properties shall revert to the state . . . ."  *Id.*, §5.  If the property reverted to New York, it would become unappropriated state land rather than part of the barge canal system.  *Id.*, §8.

In 1945, the Legislature amended the 1944 Act to include in the description of the property the Henry Street Basin up to the eastern edge as defined by the Bulkhead Line established in 1875.  1945 N.Y. Laws Ch. 899, §2 (adding new §18 to 1944 Act covering the Henry Street Basin).  Additionally, the 1945 Act amended the 1944 Act to permit expressly the Port Authority to convey some of the property to the City of New York in trust for a park or

6

playground, and to allow title to that specific portion to pass without other condition or possibility of reversion to the State. *Id.*, §1 (adding new §6-a to 1944 Act).

The Port Authority used the property as a grain terminal until 1965, after which the property lay unused. The Port Authority sold the property in 1997 to GIP by quitclaim deed. Prior to the sale, the Port Authority obtained a letter from Darrell W. Harp, Chairperson of the Property Review Executive Group of the New York Department of Transportation ("DOT"), that stated that the DOT, as the successor "to the jurisdiction of the Department of Public Works with respect to the reversionary interest in the Property, hereby waives the State's option provided in Section 3 of the Legislation to have the Property revert to the State by reason of such sale." On February 24, 1997, the DOT executed on behalf of the Port Authority a release of all right, title and interest of the State of New York to the property , "including the conditions and the right to enforce the conditions remaining in force . . . as well as any reversionary rights associated with such conditions." That release was approved by the State attorney general's office but only as to form and manner of execution.

Since GIP purchased the property, it has not used the Henry Street Basin to deliver or offload products or materials. GIP has not installed any mechanism to tie up docked vessels in the Henry Street Basin. Prior to this litigation, GIP never requested that Hess move any vessel to permit passage of another vessel.

## The Conveyance of Lands to Hess

In 1885, William and Mary A. Beard conveyed lands including the Brooklyn Terminal by deed to Jeremiah P. Robinson (the "Robinson Deed"). Part of the lands described in the Robinson Deed include the following:

7

> BEGINNING at the corner formed by the intersection of the
> Southerly side of Halleck Street with the westerly side of Clinton
> Street thence running Westerly along the Southerly side of Halleck
> Street (323) three hundred and twenty three feet *to the centre line
> of Henry Street Slip thence running Southerly along the centre line
> of Henry Street Slip and parallel with Clinton Street (700) seven
> hundred feet* thence running Easterly parallel with Bryant Street
> (323) three hundred and twenty three feet to the Westerly side of
> Clinton Street thence running Northerly along the Westerly side of
> Clinton Street (700) seven hundred feet to the point of place of
> beginning Being [certain lots] . . . *also including the one half of
> Henry Street Slip lying in front of and adjoining said lots* and also
> the whole of Bryant Street lying between said Blocks . . . the parcel
> of land and land under water lastly above described being subject
> to the covenants and agreements relating to the use of the Henry
> Street Slip hereinafter particularly set forth . . . .

(Sims Dec., Ex. 7, Liber 1601 at p. 392.) (emphasis supplied). In other words, the Robinson

Deed purported to convey title to the lands under water extending from the eastern side of the

Henry Street Basin to the center of the basin.

The referenced covenants and agreements required that Robinson would "not fill in

obstruct erect or build any build[*illegible*] structure or floating structure upon or across Henry

Street Slip . . . and will at all times keep Henry Street Slip open as a slip for the navigation of

vessels . . . ." (*Id.*, Liber 1601 at p. 398-99.) Robinson further agreed not to permit any vessel to

moor, anchor or station "as to obstruct the full use and enjoyment of said Slip or so as to obstruct

or hinder full and free access to or egress from said Slip by all vessels" and to remove any vessel

that did block access upon demand. (*Id.*)

Lands described in the Robinson Deed (including the claim to the center of the Henry

Street Slip) were subsequently conveyed in 1916 to the Marginal Dock Company by the

8

executors of the Robinson estate and his heirs. In 1942, the Marginal Dock Company transferred part of that property to Bushey, which is now a wholly owned subsidiary of Hess.[3]

It is uncontested that Hess, through its subsidiary Bushey, owns all right, title and interest in the lands and structures along the eastern side of the Henry Street Basin, including the 500 foot pier that extends southward into the Gowanus Bay (the "Finger Pier"). For many years, Hess has operated an oil depot on this property. Hess offloads oil from vessels docked at the Finger Pier into pipelines for transport to oil tanks and eventual delivery via trucks to homes and businesses in the New York City area. For many years, Hess had docked vessels along the eastern and western sides of the Finger Pier, without objection from the Port Authority.

## The Bulkhead

At some unknown point in time, a wooden bulkhead was sunk into the tidebed just west of the bulkhead line running along the east side of the Henry Street Basin. The earliest map showing the wooden bulkhead is a 1945 survey map created for the Port Authority. Earlier references to the bulkhead exist: the Court of Claims in 1920 found that "pile dolphins in the basin enclosed by the [Finger Pier] which came to be called the Columbia Basin" were driven sometime between the death of Beard and the 1911 appropriation. *See First Construction III*, slip op. at 9, ¶23. This wooden bulkhead (created by wooden pilings sunk into the floor of the Basin and a crib wall) ran just west of the bulkhead line[4] in a southerly direction from the north

---

[3]    Bushey also acquired the property south of the Robinson lands to the Bulkhead Line in the Gowanus Bay Channel from another company, which in turn had acquired the land from Richard Poillon, who had acquired the land from Beard in 1883.

[4]    According to a survey done in 1966, the bulkhead began at 4' 6" west of the bulkhead line and reached a point 6' 8" west of the bulkhead line 210 feet south of the north end of the basin. The distance between the two then expanded further out from 6' 8" west to 15' 4", 13' 4", 10' 9", 8' 4", and then 5' 11" over the next 318 feet. The distance between the bulkhead

9

end of the Basin before turning at a 90° angle east. In the early 1980's the Army Corps of

Engineers notified Hess that a portion of the waterside improvements were deteriorating and

recommended repairs. Hess in turn applied for permission from the Corps to renovate the

bulkhead and Piers 1 through 7, with minor work to be done on the Finger Pier. Hess modified

its applications in response to the Corps's findings that Hess's waterfront facilities were "in

imminent danger." The Corps responded by noting that Hess was permitted to make

modifications to the waterfront pursuant to the nationwide permit promulgated by the Corps.

Hess's modifications to the waterfront included installing a steel sheet bulkhead enclosed

with a thirty inch concrete cap, constructed for the sole purpose of shoring up the upland east of

the Henry Street Basin owned by Hess.[5] The new bulkhead was not designed for and is not fit for

docking or mooring commercial vessels for loading or offloading goods.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment "shall be rendered forthwith if the pleadings, depositions . . . together

with the affidavits . . . show that there is no genuine issue as to any material fact and . . . the

moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "moving party

is entitled to judgment as a matter of law [if] the nonmoving party has failed to make a sufficient

showing on an essential element of her case with respect to which she has the burden of proof."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985) (internal quotation marks and citations

---

and the bulkhead line then reduced to 1' 7" and then to only 5" for the remaining 45 feet.

    [5]    The new bulkhead runs in a straight line from the north end of the Basin 210 feet
southerly at a distance of 5' 8½" west from the bulkhead line extending to a distance of 5' 10¾"
west. The new bulkhead continues southerly for 318 more feet, running a distance of 6' 1" west
of the bulkhead line before reducing to 1' ¼", and then finally 1 inch west of the bulkhead line for
the remaining 53 feet before turning 90° east.

omitted). In deciding a summary judgment motion, a court should not resolve disputed issues of fact; rather, it simply must decide whether there is any genuine issue to be tried. *Eastman Mach. Co. v. United States*, 841 F.2d 469, 473 (2d Cir. 1988). A disputed fact is material only if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant such that a reasonable jury could return a verdict in her favor. *Id.*, at 248-49. The motion "will not be defeated merely . . . on the basis of conjecture or surmise." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991). "In assessing the record to determine whether there is a genuine issue of fact, the court is required to draw all inferences in favor of the party against whom summary judgment is sought." *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989).

The standard for cross-motions for summary judgment is the same as that for individual motions for summary judgment. *See Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). Each motion is considered independently of the other; when evaluating each, the court considers facts in the light most favorable to the non-moving party. *See id.*

## DISCUSSION

### I.     The Claims Regarding the Bulkhead

GIP's first three claims for relief involve the dispute over the bulkhead. In its first claim for relief, GIP seeks a judgment declaring that (i) the bulkhead is within the legal description of the property, and therefore constitutes part of the property, (ii) GIP is the sole and exclusive legal and equitable owner of the property, (iii) GIP is entitled to sole, exclusive and unfettered use of and access to the bulkhead, and (iv) Hess has no legal or equitable claim to the ownership or use

11

of the bulkhead. As to its second and third claims for relief, GIP seeks compensatory and punitive damages respectively for the trespass allegedly caused by Hess's continued occupation of the Bulkhead and entry onto the lands under water in the Henry Street Basin.

It should be noted, given the interest reserved to the State of New York (and apparently triggered by the Port Authority's sale of the property), that to quiet title completely to land in which the State has an interest raises serious constitutional questions under the Eleventh Amendment absent the State's consent. *See Idaho v. Couer d'Alene Tribe of Idaho*, 521 U.S. 261, 282 (1997) (Eleventh Amendment poses bar to federal courts quieting title in which state has interest). Accordingly, it should go without saying that any judgment is limited to the parties before the Court and does not adjudicate the rights of the State of New York or the Port Authority. *See Tindal v. Wesley*, 167 U.S. 204, 223 (1897) (holding that despite judgment between private individuals, "it will be open to the state to bring any action that may be appropriate to establish and protect whatever claim it has to the premises in dispute").

## A. Declaratory Judgment Regarding the Bulkhead

A federal district court should exercise its discretion in issuing a declaratory judgment "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Broadview Chemical Corp. v. Loctite Corp.*, 417 F.2d 998, 1001 (2d Cir. 1969) (internal quotations omitted). "[I]f either of these objectives can be achieved the action should be entertained and the failure to do so is error." *Id.* A declaratory judgment here would clarify the legal relations in issue and terminate the uncertainty that gave rise to this action, with the exception of one claim noted below.

12

1. **The Location of the Bulkhead**

The undisputed facts establish that the Bulkhead lies west of the Bulkhead line and squarely within the Henry Street Basin (and therefore within the Gowanus Bay Terminal property conveyed to the Port Authority in 1944). Hess's defenses to locating the bulkhead outside its property line rest on two arguments: first, that Hess in fact has title to a significant portion of the Henry Street Basin pursuant to the Robinson Deed, and second, that the Port Authority's acquiescence over so many years to the placement of the Bulkhead approximately where it exists today constitutes a binding change in the location of the property line. Both of these arguments are without merit, and the Bulkhead is therefore declared to be within the property.

a. **Hess's Claim to the Northeast Quadrant of the Henry Street Basin**

Hess argues first that it has superior title to the so-called "Northeast Quadrant" of the Henry Street Basin. Hess's claim to the Northeast Quadrant in the Henry Street Basin can be traced back to the conveyances made by Beard to Robinson in 1885, which extended to the middle of the Henry Street Basin. As Hess admits, however, the title to the lands under the water was based upon the 1884 Act that purported to vest title in the submerged lands in Beard. (*See* Hess Reply Mem. at18, n. 6.) The Court of Appeals subsequently held that the 1884 Act vested title solely in those lands that had been filled in, and otherwise did not vest title in those lands still submerged. *First Construction II*, 221 N.Y. at 315-16, 116 N.E. at 1025-26. Although the Court noted that the remaining statutory franchise to fill in the lands under water was a property right requiring compensation upon a taking, *id.*, 221 N.Y. at 316, 116 N.E. at 1026, it held that to the extent the 1884 Act sought to "enlarge the grant of a mere right or privilege not theretofore exercised, although property, into a title in fee," the 1884 Act was void as unconstitutional. *Id.*, 221 N.Y. at 320, 116 N.E. at 1027. Moreover, the Court of Appeals affirmed Judge Haight's

13

decision that the lands under water constituting the Henry Street Basin (as defined by the 1875 bulkhead line) had never passed into private ownership. *Id.*, 221 N.Y. at 324-25, 116 N.E. at 1029.

In summary, the 1884 Act only reaffirmed Beard's franchise to fill in the submerged lands, and that franchise only extended out as far as the bulkhead line. *See* 1884 N.Y. Laws Ch. 491; *First Construction II*, 221 N.Y. at 316, 116 N.E. at 1026. The Court of Appeals separately affirmed that the Henry Street Basin remained always in the hands of the State of New York. *Id.*, 221 N.Y. at 324-25, 116 N.E. at 1026. Hess therefore cannot rely upon the Robinson Deed to claim title to these lands.

### b.     Hess's Claim to Ownership Based on Acquiescence

Hess's second argument is that even if the Bulkhead falls outside of its property line as defined by the bulkhead line, the decades-long acquiescence by the Port Authority has shifted the property line to the practical division created by the Bulkhead itself. GIP argues that the mere silence of the Port Authority should not estop GIP from pursuing its claim to ownership of the entire Henry Street Basin.

In New York, a plaintiff normally may bring a claim for trespass or nuisance against another's continuing violation, even if the plaintiff was silent during the construction of the obstacle. *See Ackerman v. True*, 175 N.Y. 353, 362, 67 N.E. 629, 631 (1903) ("The principle of these cases renders it apparent that there has been no such acquiescence on the part of the plaintiff as will justify the court in refusing to grant her the relief sought, unless she has been guilty of some act or conduct which would amount to an estoppel . . . . silence will not estop unless there is not only a right but a duty to speak."); *cf. Galway v. Metro. El. Ry. Co.*, 128 N.Y. 132, 28 N.E. 479 (1891) (holding that easement holder's failure to complain about construction

14

of elevated railway across easement for twelve years did not bar suit to enjoin further maintenance of the railway).

However, in some cases, the practical existence of a physical boundary between two properties may adjust their boundaries. *See, e.g., Van Dusen v. Lomonaco*, 24 Misc.2d 878, 881, 204 N.Y.S.2d 778, 782 (Sup. Ct. Madison Co. 1959) (holding that it would be unjust to adopt as true the boundary line as marked by surveyor where for 39 years boundary was located physically by fence or by marker between adjoining properties 3 feet away from surveyed line); *Wentworth v. Braun*, 78 A.D. 634, 79 N.Y.S. 489 (1st Dep't), *aff'd*, 175 N.Y. 515 (1903) (holding that a boundary line dividing properties was practically established by placement of fences, even if the fences shifted the boundary by 1 foot).

Hess argues that by the constant presence of the bulkhead (of which the Port Authority was aware as early as 1945), and by the active work done to replace the bulkhead pursuant to a duly-issued permit from the Army Corps of Engineers, the Port Authority has acquiesced in the establishment of the bulkhead as the practical boundary between Hess's property and the Gowanus Bay Terminal. In order for the practical boundary to be adopted, however, there must be some action by both landowners. *See Hadix v. Schmelzer*, 186 A.D.2d 239, 588 N.Y.S.2d 337 (2d Dep't 1992). In *Wentworth*, for example, the proof showed that both owners of adjoining lots had built fences along the practical boundary. 78 A.D. at 635, 79 N.Y.S. at 491. Similarly, in *Van Dusen*, a prior owner of the adjoining property testified that she had always considered the fence to be the boundary line. 24 Misc.2d at 881-82, 204 N.Y.S.2d at 782-83.

Hess does not point to any activity taken by the Port Authority, other than remaining silent, that shows adoption or acquiescence in marking the boundary line with the physical bulkhead. Further, although there is no case directly on point, the existence of a structure under

15

the waters of the Gowanus Bay (even if known) does not lend itself to the type of confidence in assuming acquiescence that fences, walls or other marks on solid ground would inspire. Hess is therefore not entitled to summary judgment on its defense of acquiescence.[6]

## 2. Title Ownership of the Henry Street Basin

The Port Authority took title to Henry Street Basin subject to the condition that it could not convey title to any entity other than the State. 1944 N.Y. Laws Ch. 410, §3(c). When GIP sought to purchase the property, the DOT executed a release of any interest that the State had in the property, including any right of reversion, and any right to enforce the 1944 Act. Hess argues that this release is ineffective and that under the 1944 Act, the Port Authority (or possibly the State pursuant to its now-triggered interest, *see id.* §5) still holds title to the land. Hess's arguments are essentially two-fold: first, that permissible transfer of title to another entity could only be accomplished by an Act of the Legislature, and second, that even assuming arguendo that the State could waive the Act by executive decision, the waiver should have been executed by the New York State Thruway Authority (the "Thruway Authority") pursuant to a 1992 transfer of jurisdiction. (*See* Hess Reply Mem. at 13-15, *citing* N.Y. Canal Law, Art. I-A, § 5 (transferring

---

[6]       The Court also notes that neither party addresses the issue of whether the doctrine of acquiescence could apply against a governmental entity like the Port Authority. Traditionally, similar property doctrines such as adverse possession or prescription cannot apply against the government as long as it is acting in its governmental capacity as opposed to its proprietary capacity. *See In re City of New York (Mileau Corp.)*, 72 A.D.2d 745, 746, 421 N.Y.S.2d 258, 259-60 (2d Dep't 1979) ("Title to land under water once vested in the municipality cannot be divested by adverse possession, even after it is filled, if it was made inalienable by statute or it is held for a public purpose; if it is held merely in a proprietary capacity and there is no statutory prohibition to alienability, the converse is true."); *see also Montfort v. Benedict*, 199 A.D.2d 923, 925, 605 N.Y.S.2d 549 (3d Dep't 1993) (noting that once canal land is declared abandoned and not held for any governmental or public purpose, the land is held in proprietary capacity and subject to prescription). Although the record establishes that the property has not been used since 1965, neither party addresses whether the property was held since that time in a proprietary or governmental capacity.

16

powers and duties of the commissioner of transportation, including power to abandon barge canal lands, to the Thruway Authority).)

The 1944 Act clearly limits the Port Authority's right or ability to transfer the properties: the Port Authority "shall not grant or convey title to said pier properties to any person or legal entity other than the state." 1944 N.Y. Laws Ch. 410, §3(c). The only occasion prior to the present dispute on which some of the property was transferred, the conveyance of the land to the City of New York for a park or playground, was accomplished by *another* act of the Legislature.

There appears to be no authority for the proposition that an Act of the Legislature forbidding the transfer of the property can be voided by a release from the DOT absent an explicit grant of authority to the DOT to issue such a release. The provision of the 1944 Act prohibiting the Port Authority from conveying the land does not delegate any responsibility regarding this restriction to any state agency. By comparison, the only other permanent condition in the 1944 Act (the six-month maximum exclusivity requirement) *explicitly* permitted the Superintendent of Public Works (the predecessor in interest to the DOT Commissioner) to waive compliance. *See* 1944 N.Y. Laws Ch. 410, §3(b); *see also* N.Y. Canal Law §50, historical notes (noting that 1968 N.Y. Laws Ch. 420, §38 substituted DOT Commissioner for the Superintendent). No similar provision gave the Superintendent authority to consent to the conveyance of title to another entity.

Further, the exemption from all taxation of the property tends to show that the Legislature intended the property to remain in public hands. For example, the only other subsequent conveyance of part of the lands in question was made to another governmental entity, the City of New York, to hold in trust as a park or playground, and was explicitly approved by the Legislature.

17

Even if an act of the New York State Legislature were not required for the Port Authority to convey the land to a third party, GIP still cannot establish good title to the property. Until 1992, DOT was authorized "to abandon any portion of barge canal lands, barge canal terminal lands . . . which have or may become no longer necessary or useful . . . for barge canal purposes." N.Y. Canal Law § 50. In 1992, the Legislature amended the Canal Law to provide: "*All references* to the commissioner of transportation and the department of transportation contained in this chapter, except in this article and articles seven and thirteen-A of this chapter, shall be deemed to mean the [Thruway] authority." 1992 N.Y. Law Ch. 766 §4 (adding N.Y. Canal Law. Art. I-A, §5) (emphasis added). These references include the authority to abandon property. *See* N.Y. Canal Law §50 (located in article six of the Canal Law).

GIP argues that despite the clear language of the statute, the intent of the transfer of the authority in 1992 dealt with the Erie Canal and similar other historical canals in the State of New York, and not the Gowanus Canal or the property in question here, and that it is impossible to believe that the transfer of jurisdiction covers those properties since the Gowanus canal is not in the scope of the current state canal system. To support this argument, GIP points to the Canal Corporation's website (http://www.canals.state.ny.us/faq/), which states that the Thruway Authority received responsibility for the 524-mile Canal System in 1992 and that the Canal System "crosses upstate New York." *Id.* GIP also points to a conversation with "a longtime attorney with the Canal Corporation" who confirmed that neither the Thruway Authority nor its subsidiary the Canal Corporation have or had responsibility over the Gowanus Canal. (*See* GIP Reply Mem. at 6-7; Wolkenstein Reply Dec., ¶¶2-3.)[7] GIP further points (in its letter brief dated

---

[7]      Although this conversation would be inadmissible given that it is presented as unsworn hearsay testimony, its admissibility is moot since GIP's argument is rejected.

18

September 30, 2002) to the 1992 legislative findings defining the New York state canal system, "which consists of the Erie, Champlain, Oswego, and Cayuga and Seneca canals," *see* 1992 N.Y. Law. Ch. 766, §1, and the definitions regarding waterfront revitalization in the Executive Law distinguishing "coastal waters" (like the Hudson and East Rivers) from "inland waterways" (which include the Barge Canal System as defined in the Canal Law). *See* N.Y. Exec. Law §911(3) and (4).

However, GIP fails to note that the Barge Canal System includes "canal terminal lands," N.Y. Canal Law §2(1), which in turn means "canal lands acquired under the provisions of chapter seven hundred and forty-six, laws of nineteen hundred eleven." Those lands acquired under Chapter 746 include the Gowanus Bay Terminal, i.e., the lands in question in this case. Moreover, GIP does not point to any relevant exceptions to the 1992 change providing that all references to the DOT Commissioner are deemed to refer to the Thruway Authority. Although the power to make decisions about reversionary interests in properties no longer an active part of the canal system may seem tangential at best to the general purpose of the transfer of authority (relating primarily to the recreational uses for the upstate canal system), the statute is clear on its face. Since by law the Gowanus Bay Terminal was canal land, any remaining authority over the land was transferred to the Thruway Authority.

Alternatively, GIP argues that the legislature removed the lands in 1944 from the state canal system (and from the restrictions imposed by Art. 15, §§ 1 and 2 of the State Constitution regarding disposing of canal lands), and therefore that the State may abandon its rights to the lands as it would any other "unappropriated state land." (*See* GIP letter brief dated 9/30/2002, at 3.) Since the 1944 Act provides that the "properties (heretofore constituting barge canal terminals and barge canal terminal lands) are no longer necessary or useful as a part of the barge

19

canal system, or as an aid to navigation thereon, or for barge canal terminal purposes," 1944 N.Y.

Law, Ch. 410, §2, GIP argues that these properties were then removed from the barge canal

system and from the auspices of the barge canal law. (*See* GIP letter brief dated 9/30/2002, at 3

("If the grain terminal and the related land under the Basin are no longer necessary . . . then the

logical things to do was to take them out of that system. That is precisely what the Legislature

did."))

If GIP is correct that the Gowanus Bay Terminal was no longer part of the canal system in

1992 and was therefore excluded from the transfer of authority, then its argument proves too

much. GIP points to no basis for giving the DOT power to release the state's interests in

unappropriated state lands that are no longer governed by the Canal Law. If the lands are not

"abandoned canal lands" pursuant to the Canal Law, then the Commissioner of General Services

(and not DOT) is the person statutorily authorized to sell such "unappropriated state lands." *See*

N.Y. Public Lands §33. In other words, either the lands fall within the scope of the Canal Law

and hence the jurisdiction of the Thruway Authority after 1992, or else they fall outside of the

Canal Law and their sale would be governed by the Public Lands Law under the auspices of the

Commissioner of General Services.

Finally, GIP argues that New York's interest in the property remains inchoate and

unexercised, since the remedy for the Port Authority's violation of the 1944 Act is that "at the

option of the state the pier properties shall revert to the state . . . ." 1944 N.Y. Laws Ch. 410, §5.

GIP thus argues that until New York exercises this option, it holds title to the land under the deed

from the Port Authority. However, this argument elides over the first stumbling block to GIP's

title – by law, the Port Authority could "not grant or convey title to said pier properties to any

person or legal entity other than the state." *Id.*, §3(c). The conveyance is a nullity. What GIP

20

perceives as an option would be in fact a decision by the State of New York to permit the Port Authority to retain the property or else to exercise its option and have the property revert back to the State.

Accordingly, GIP does not have title to the land, and no declaratory judgment can be awarded to it for the remaining part of its first claim for relief.

## C.    The Claims of Trespass Regarding the Bulkhead

The lack of title does not resolve the issue. GIP argues that whether it has proper title is irrelevant, since Hess's alleged trespasses violate its possession of the lands. In New York, "[a]s against a trespasser, it would be immaterial that the plaintiff had no title to the land." *Beardslee v. New Berlin Light & Power Co.*, 207 N.Y. 34, 41, 100 N.E. 434, 437 (1912); *see generally* 104 N.Y. Jur. 2d Trespass §21. In other words, so long as GIP is in actual possession of the land it may maintain an action for trespass against Hess. *Miller v. Long Island Ry. Co.*, 71 N.Y. 380, 383 (1877). If GIP is in actual possession, then Hess must defend itself "by virtue of its own title" and any weaknesses (or nullities) in GIP's title are irrelevant. *Beardslee*, 207 N.Y. at 41, 100 N.E. at 437. In order to show actual possession, a party that takes the property under a written instrument need only show actual possession of some part in order to claim constructive possession of the whole property. *See Donohue v. Whitney*, 133 N.Y. 178, 30 N.E. 848 (1892) ("Having shown that he entered more than 30 years ago under a written instrument purporting to convey the locus in quo, and that he had cleared and improved and actually occupied a part of the premises, he had established a constructive possession to the whole lot described in his deed.").[8]

---

[8]    *But see Thompson v. Burhans*, 61 N.Y.2d. 52 (1874) (noting exceptions to rule where person claiming possession under color of title did not occupy large tracts of land that were of a nature different to that actually possessed and unsuitable to the use land normally put to in that county).

21

Although Hess presents other arguments for holding that no trespass is occurring, *see infra*, they are immaterial since GIP did not present any evidence that it is in actual possession of any part of the property. In its complaint, GIP does not allege any facts showing possession, but merely alleges that it is the title owner of the Gowanus Bay Terminal, including the Henry Street Basin. (*See* Compl. ¶¶ 17, 22-23, 39, 35.) Hess submitted uncontested evidence that GIP has done nothing to make the western side of the Henry Street Basin suitable for mooring or docking vessels.

While GIP did not point to any evidence regarding its actual possession of the property, a search of the supporting memoranda and evidence reveals only one statement by counsel that might permit the Court to draw inferences regarding GIP's actual possession of the property. In the response to Hess's interrogatories, counsel for GIP stated that there exists an officer named John Quadrozzi, Jr. "who runs day to day operations of GIP." (Wolk. Dec., Ex. D at 4.) Although this statement would imply that GIP has operations somewhere, the interrogatories do not state where GIP maintains its offices, nor if Mr. Quadrozzi or anyone else conducts any business on the Gowanus property. More importantly, the answers to the interrogatories lack any indicia that they were made under oath as required by Fed. R. Civ. P. 33(b)(1) and therefore are not considered for purposes of this motion.

There are therefore no facts in evidence supporting GIP's claim to actual possession of the property. Absent such facts, Hess is entitled to summary judgment on these trespass claims.

D.    **Hess's Other Arguments Regarding Trespass**

Hess additionally argues that it should prevail on the trespass claim for two other reasons: first, that Hess's riparian rights permit it to maintain the bulkhead in its current location and second, that no damages have been shown to exist. Although this Court is well aware of Sir

22

Francis Bacon's observation that "an over-speaking judge is no well-tuned cymbal," it ventures to address these additional arguments.

### 1.    Hess's Riparian Rights

Hess argues that as an owner of upland adjacent to navigable waters, it possesses certain riparian rights[9] that permit it to maintain the bulkhead and to use both sides of the Finger Pier. In opposition, GIP argues first that Hess's common law riparian rights were superseded by the statutory scheme adopted for development of the Gowanus Bay. Specifically, GIP argues that from 1857 to 1875, the State of New York essentially negotiated with upland owners on the Gowanus Bay to facilitate the construction of a port facility, and in so doing replaced their common law rights with the specific rights set forth in the statutes. Since there is nothing in any of those statutes that explicitly eliminates (or even mentions) common law riparian rights, GIP argues that this case is comparable to *James Frazee Milling Co. v. New York*, 122 Misc. 545, 204 N.Y.S. 645 (Ct. Cl. 1924).

In *James Frazee*, the State in 1809 authorized the owner of land along the Seneca River to construct a dam across the river in order to aid in its navigation, and simultaneously granted the owner the right to draw certain amounts of water flowing from the pond behind the dam. *Id.*, 122 Misc. at 548-49, 204 N.Y.S. at 648-49. A referee appointed by the Court of Claims held that this grant was in fact a contract that, in exchange for the construction of the dam, gave the upland owners private property rights in the flow of the river superior even to the right of the State of

---

9       As the parties note, strictly speaking the rights involved in this case are littoral rights since the property is bounded by the seashore. *Town of Oyster Bay v. Commander Oil Corp.*, 96 N.Y.2d 566, 571, 759 N.E.2d 1233, 1236, 734 N.Y.S.2d 108, 111 (2001) ("*Commander Oil*"). However, the distinction is vestigial, and parties frequently describe littoral rights as riparian rights. *Id.* For purposes of this opinion, this Court will do so as well.

New York to act on behalf of navigation. *Id.*, 122 Misc. at 552, 204 N.Y.S. at 652. Based on these rights, the referee held that the State of New York could not take (without compensation) waters from the river for the purpose of aiding public navigation if by doing so it would reduce the flowrate of water to which the upland owners were entitled by the previous statute. *Id.*, 122 Misc. at 556, 204 N.Y.S. at 655. However, it should be noted that although this development of the Seneca River granted the upland owners certain statutory rights in the nature of a contract, it did not extinguish any of the riparian rights held by the upland owners. *See id.*, 122 Misc. at 558, 204 N.Y.S. at 656-57 (holding that, unlike statutory rights, riparian rights remained qualified by state's right to improve the navigability of the river).

The holding in *James Frazee* is not applicable here. In that case, the general right of the State to act in the public interest (by further improving public navigation of the Seneca River) was limited by the statutory rights granted to the upland owner, and those statutory rights could be enforced by the successors in interest to the original upland owner. Here, Hess is not seeking to enforce any statutory rights that might exist (as the successor in interest to Beard, who developed the waterfront at the behest of the State), but rather to enforce its common law riparian rights. Nothing in the holding of *James Frazee* nor in the statutes passed by the Legislature leads to the conclusion that Beard sacrificed his riparian rights (or the rights of his successors) in the surrounding waters. Indeed, the riparian owners in *James Frazee* retained their general riparian right *in addition to* the rights granted by statute. *See id.*, 122 Misc. at 558, 204 N.Y.S. at 656-57. Therefore, this Court must examine the scope of Hess's riparian rights.

GIP also argues that Hess has already exercised its riparian rights to the maximum degree allowed since at common law the upland from which the riparian rights derive does not include the lands under water over which an upland owner exercises its riparian rights, and that even

24

when filled in, lands originally under water are treated as such. (GIP Mem. at 17-18 (citing *In re 12th Avenue*, 295 N.Y. 415, 429, 68 N.E.2d 422, 427 (1946).) As noted above, however, the 1884 Act clearly vested title in Beard in all the lands then filled in, and there is little reason to doubt that an owner of land next to water can exercise riparian rights. As even the case on which GIP relies notes, "land under water may lose its 'character of foreshore' at least for some purposes, with consequent changes in rights and legal relations, where the filling in is pursuant to permission or grant." *12th Avenue*, 295 N.Y. at 429, 68 N.E.2d at 427-28. Accordingly, before GIP can pursue this argument, it would need to supply evidence that the uplands adjoining the Bulkhead had not been filled in prior to the vesting of title in 1884. However, no such evidence exists in the record before the Court, and therefore this argument is not persuasive.

Under New York law, as a riparian owner Hess "has the right of access to navigable water, and the right to make this access a practical reality by building a pier, or 'wharfing out.'" *Commander Oil*, 96 N.Y.2d at 571, 759 N.E.2d at 1236, 734 N.Y.S.2d at 111. Even if GIP in fact owns the lands under water in the Henry Street Basin, it would "hold[] the land in 'trust for the public good.'" *Id.*, 96 N.Y.2d at 571, 759 N.E.2d at 1236, 734 N.Y.S.2d at 111; *see Tiffany v. Town of Oyster Bay*, 234 N.Y. 15, 20, 136 N.E. 224, 225 (1922) ("The foreshore or land under the waters of the sea and its arms, between high and low-water mark, is subject, first, to the jus publicum – the right of navigation, and when the tide is out, the right of access to the water for fishing, bathing and other lawful purposes.")

This public trust notion is perhaps most famously articulated in the Institutes of Justinian:

> Things common to mankind by the law of nature, are the air, running water, the sea, and consequently the shores of the sea; no man therefore is prohibited from approaching any part of the seashore, whilst he abstains from damaging farms, monuments, edifices, etc., which are not in common as the sea is.

Inst. Justinian §2.1.1, *translated in* T. Cooper, The Institutes of Justinian (1812) (as quoted in

*Dep't of Nat. Resources v. Mayor and Council of Ocean City*, 332 A.2d 630, 637 n.8 (Md.

1975)). The doctrine existed in early English law, and was then adopted by the states after the

American Revolution

> In England, from the time of Lord Hale, it has been treated as
> settled that the title in the soil of the sea, or of arms of the sea,
> below ordinary high water mark, is in the King; except so far as an
> individual or a corporation has acquired rights in it by express
> grant, or by prescription or usage and that this title, jus privatum,
> whether in the King or in a subject, is held subject to the public
> right, jus publicum, of navigation and fishing. Not surprisingly,
> American law adopted as its own much of the English law
> respecting navigable waters, including the principle that submerged
> lands are held for a public purpose.

*Idaho v. Couer d'Alene Tribe of Idaho*, 521 U.S. 261, 284 (1997) (internal quotations and

citations omitted).

As the New York Court of Appeals held, "neither [the owner of the lands under water]

nor [the riparian owner] may exercise its rights in a manner unreasonably intrusive upon the

other's rights." *Commander Oil*, 96 N.Y.2d at 572, 759 N.E.2d at 1236, 734 N.Y.S.2d at 111.

Therefore the issue is one of reasonableness. In *Commander Oil*, the Court of Appeals held that

where a riparian owner dredged lands under water owned by another party, such dredging could

be enjoined only if the dredging "would destroy, or seriously impair, its rights as owner of the

underwater land." *Id.*, 96 N.Y.2d at 573, 759 N.E.2d at 1237, 734 N.Y.S.2d at 112. Since the

dredging there was necessary to maintain the riparian owner's access to navigable waters and did

not otherwise unreasonably interfere with the land owner's rights, the Court of Appeals reversed

an injunction prohibiting the dredging. *Id.*, 96 N.Y.2d at 574, 759 N.E.2d at 1238, 734 N.Y.S.2d

at 113. However, at the same time, the Court cautioned that "a riparian owner does not have the

26

right to maintain the foreshore in the precise condition that existed when the riparian owner acquired the land or built a facility for docking." *Id.*; *see also id.*, 96 N.Y.2d at 575-6, 759 N.E.2d at 1239, 734 N.Y.S.2d at 114 ("The issue was not whether Commander [the riparian owner] was entitled to preserve its original level of access to navigable water, but whether Commander needed to dredge in order to assure reasonable access.")

The issue here therefore is whether the bulkhead's existence is necessary in order to assure Hess's reasonable access to navigable waters and, if so, whether its continued existence would seriously impair or destroy GIP's rights as the purported possessor of the submerged land. It is undisputed the bulkhead was renovated and replaced in the 1980's in order to shore up the lands on which oil tanks exist, and that a failure to maintain the bulkhead would lead to soil erosion and collapse of the oil tanks. A collapse of such tanks would not only significantly impair Hess's facilities, it could also impair the public's rights of access to the Henry Street Basin and other use of the waters surrounding the Henry Street Basin. Absent the existence of an alternative proposal, *see id.*, the maintenance of some sort of bulkhead seems necessary to prevent such a collapse.

GIP argues in reply that this proves too much, since it is not the oil tanks that are in aid of navigation of vessels or that provide access to the navigable water. GIP compares maintaining the bulkhead to any other unauthorized entry onto land, and argues that if Hess needs to maintain structures on its property (like the oil tanks), it should do so on its property. Although the bulkhead itself (or the oil tanks it supports) does not provide access per se, without the bulkhead access to the waters (and from the waters to the land) will diminish as the soil subsides and the oil tanks fall into the waters around it.

Case 1:01-cv-00902-ILG-ASC   Document 31   Filed 09/11/03   Page 28 of 33 PageID #: 28


Although there does not seem to be any case precisely on point, generally determinations of reasonableness of the exercise of riparian rights is a question of fact. *See Tiffany*, 234 N.Y. at 23, 136 N.E. at 226 ("What is a reasonable use of the foreshore by the proprietary is to some extent a question of time, degree, and circumstance."); *Water Street Assocs. L.P. v. Innopak Plastics Corp.*, 646 A.2d 790 (Conn. 1994) (noting that trial court took testimony before finding that boundary line between adjoining properties provided reasonable access to both owners); *Tapoco, Inc. v. Peterson*, 373 S.W.2d 605, 608 (Tenn. 1963) (holding that reasonable access and use of waters is a question of fact); *cf. Adirondack League Club, Inc. v. Sierra Club*, 92 N.Y.2d 591, 605, 706 N.E.2d 1192, 1196, 684 N.Y.S.2d 168, 172 (1998) (holding that navigability of stream is for trier of fact to determine). Since neither party presented facts regarding the reasonableness of maintaining the bulkhead, summary judgment would not be available to either party based on the reasonableness of maintaining the bulkhead.

### 2. Existence of Damages

Although Hess also moves for summary judgment on the basis that GIP has not adduced any evidence that it has been damaged, Hess admits that if GIP could establish a claim for trespass, at the very least GIP would be entitled to nominal damages. GIP in turn clarifies on reply that its motion for summary judgment did not extend to damages, and that in any event, damages for trespass arguably can include the cost of restoring the land to its condition absent the trespass, and restitution based on the benefits received by Hess from maintaining the Bulkhead in the Henry Street Basin. *Granchelli v. Walter S. Johnson Building Co., Inc.*, 85 A.D.2d 891, 891, 446 N.Y.S.2d 755, 756 (4th Dep't 1981). If summary judgment on the trespass claim were not otherwise appropriate, summary judgment based solely on the issue of lack of actual damages would be unavailable.

28

## III.   The Claims Regarding the Western Side of the Finger Pier

GIP's last three claims for relief involve the dispute over Hess's use of the western side

of the Finger Pier. In its fourth claim for relief, GIP seeks a judgment declaring that (a) the

submerged land to the west of the Finger Pier is within the legal description of the property, and

therefore legally constitutes part of the property, (b) that GIP is the sole and exclusive legal and

equitable owner of the property, including the submerged lands to the west of the Finger Pier, (c)

that Hess's use of the western side of the Finger Pier (namely the docking of barges and boats) is

unlawful and in derogation of GIP's rights, and (d) that Hess has no legal or equitable claim to

the use of the western side of the Finger Pier. As to its fifth and sixth claims for relief, GIP seeks

compensatory and punitive damages respectively for the alleged trespass resulting from Hess's

use of the western side of the Finger Pier. In reply, Hess contends, in addition to its argument

noted above that GIP lacks title, that its riparian rights permit it to use the waters to the west of

the Finger Pier even if the lands under those waters belong to another.

Since neither party disputes the fact that the submerged lands to the west of Finger Pier

are part of the property in question, a declaratory judgment to this effect is unnecessary since it

would neither clarify nor settle the legal relations between the parties, nor would it afford any

relief, and therefore this Court exercises its discretion to decline to hear the claim.

GIP and Hess do dispute whether Hess has the right to dock ships in the waters along the

western side of the Finger Pier, which waters cover land to which GIP claims title. Although the

same issues that warrant judgment in Hess's favor with regard to the bulkhead claims, namely

GIP's lack of title and the absence of evidence of actual possession, apply equally herein, GIP's

claims can also be dismissed based on the public rights of all persons (including Hess) to make

reasonable use of the navigable waters along the western side of the Finger Pier for transportation, commerce and recreation.

GIP argues that since Hess can reasonably access the navigable waters in the Gowanus Bay by using the eastern side of the Finger Pier, its rights should not include the right to dock vessels along the western side of the Finger Pier (and thus in the waters above the submerged lands in question). GIP specifically points to cases preventing a wharf owner from extending other docks out over the water in front of adjacent property.[10] Clearly GIP (as an upland owner) has the common law right to wharf out in the waters in question here (subject to the normal permits and other zoning regulations not in issue here). In *Huguenot*, the court held that the longstanding use of both sides of a yacht club's dock "gives [the club] no right to continue the use of the west side of the dock or to prevent an adjoining owner, such as [defendant], from making full use of his riparian rights by the construction of a float on any part of the lands under water in front of his upland." 43 Misc. 2d at 147, 250 N.Y.S.2d at 554; *cf. DelBuono v. Brown Boat Works*, 696 A.2d 1271, 1277 (Conn. App. 1997) ("*once* an upland owner . . . desires to build a wharf or to exercise littoral rights, past intrusive usage for many years by the adjacent upland owner should not interfere with that right") (citing *Huguenot*). Under New York law, therefore, if GIP were to build its own dock that interfered with vessels docking along the

---

[10]    GIP also relies on the basic principle (not at issue here) that riparian rights do not permit a neighbor like Hess to expand its docks over GIP's property or to prevent GIP from building GIP's own docks in a way that might inhibit access to Hess's docks. *See generally Huguenot Yacht Club v. Lion*, 43 Misc. 2d 141, 250 N.Y.S.2d 548 (Sup. Ct. Westchester Co. 1964) (holding that defendant was entitled to build a floating dock that interfered with vessels access to one side of plaintiff's pier); *Jenks v. Miller*, 14 A.D. 474, 43 N.Y.S. 927 (2d Dep't 1897). Of course, the present case does not raise that issue since GIP does not claim that it wishes to (or has obtained permits to) create a dock close to the Finger Pier.

western side of the finger pier, GIP would be acting within its riparian rights (although such construction might be limited by other regulations of the waterfront).

From this inherent power to build its own dock or wharf (that would interfere with the free flow of navigation to all sides of Hess's pier), GIP seeks to exclude the same navigation altogether without having to undertake such construction. An absolute right to exclude Hess's vessels does not follow from an otherwise unexercised right to wharf out, since the owner of lands under water is required to hold that land in trust for the use of the public (including its neighbor Hess) for navigation. *See Tiffany*, 234 N.Y. at 20-21, 136 N.E. at 225; *Macrum v. Hawkins*, 261 N.Y. 193, 203, 184 N.E. 817, 819 (1933) ("navigable waters are of right public highways").

GIP relies upon two other cases that address the limits on the right of an adjoining landowner to dock boats or wharf out beyond its property lines, but neither is helpful to its case. In *Williams v. Consumers' Coal & Ice Co.*, the defendants docked a damaged steamer alongside their dock in such a way that the steamship extended over the boundary line between the littoral properties, and the court held that this was technically a trespass warranting nominal damages. 170 N.Y.S. 549, 550 (Sup. Ct. Richmond Co. 1917). The court specifically noted, however, that the steamship was damaged and therefore no longer in the use of navigation, and therefore not entitled to the rights of access generally permitted to vessels in navigable waters. *Id.* Such is not the case here, since the Finger Pier is being used only for vessels to dock and unload goods; no evidence is offered that unused vessels are permanently docked along the western side of the Finger Pier.

In *Gray v. Bartlett*, on which GIP also relies, the defendant was extending its wharf in a manner that interfered with the plaintiff's already existing wharf, which filled up the entire

31

frontage of plaintiff's upland and even extended over the waters of defendants' foreshore.  37

Mass. (20 Pick.) 186 (1838).  Addressing the issue presented here, *Gray* itself affirmed the right

of a dock owner to use the waters *to either side of the dock* for purposes of mooring vessels:

> Beyond the limits of his actual occupation, by building, the
> plaintiff's ancestor [and predecessor in title] had a right, in
> common only with all others, to use the space on both sides of his
> wharf, for the purposes of passing over it with boats and vessels,
> and for mooring vessels upon, as all persons have a right to use
> open navigable waters.

*Id.* at 192.  The court did dismiss the plaintiff's claim, noting that its rights were defined solely

by the limits of its boundary lines, and that the decision of another to extend a wharf within his or

her riparian rights was proper.  In other words, as noted above, if docks or other mooring

platforms were constructed that hindered access to the western side of the Finger Pier, then Hess

could not complain that such construction interfered with its common law riparian rights.  *Cf.*

*Huguenot*, 43 Misc. 2d at 147, 250 N.Y.S.2d at 554.  What *Gray* makes equally clear, however,

is that absent some actual obstacle to the approach to the western side of the Finger Pier, Hess

retains the right "in common only with all others" to make use of the space on *both* sides of the

pier.  37 Mass. (20 Pick.) at 192.

Accordingly, Hess's use of the western side of the Finger Pier (including mooring vessels

along the western side) falls within its general rights to make use of those navigable waters.

## CONCLUSION

For the foregoing reasons, Hess's motion for summary judgment pursuant to Federal Rule

of Civil Procedure 56 is granted in part as to those parts of claims I and IV seeking declaratory

relief that GIP is the sole legal and equitable owner of the property and that Hess has no legal or

equitable claim to make use of either the bulkhead or the waters to the west of the Finger Pier,

Copies of the foregoing were sent on this day to:

Pinchus D. Raice, Esq.
Raice Paykin & Krieg LLP
185 Madison Avenue, 10th Floor
New York, New York 10016

Charles S. Sims
Proskauer Rose LLP
1585 Broadway
New York, New York 10036